UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SAMANTHA BARBASH,

                              Plaintiff,

-against-

SHEIN DISTRIBUTION CORPORATION; ROADGET BUSINESS PTE. LTD.; SHEIN TECHNOLOGY LLC, SHEIN US SERVICES, LLC, ZOETOP BUSINESS COMPANY, LTD.; MICAS HOLDINGS INC., PRECISION TECHNOLOGY HOLDING LIMITED; and DOES 1-10 inclusive.

                              Defendants.

Case No. 1:25-cv-03006-LKE

**FIRST AMENDED COMPLAINT**

---

Plaintiff Samantha Barbash ("Plaintiff" or "Ms. Barbash"), by her attorneys, Rupp Pfalzgraf, LLC, hereby brings this complaint against Defendants Shein Distribution Corporation, Roadget Business Pte. Ltd., Shein Technology LLC, Shein US Services, LLC, Zoetop Business Company, Ltd., (collectively "Shein"), Micas Holdings Inc., Precision Technology Holding Limited (collectively "Micas"), and Does 1-10 inclusive (collectively, "Defendants") as follows.

**NATURE OF THE ACTION**

1. Ms. Barbash is an infamous media personality and influencer. Through many years in the industry, Ms. Barbash has built a personal brand that is widely perceived and recognized around the United States. Her story has been the subject of major motion pictures, most famously being portrayed by Jennifer Lopez in the box office hit film "Hustlers."

2. Because of the stature and influence of her public persona, the right to benefit from Ms. Barbash's publicity is highly desired by for-profit organizations seeking to monetize her name, character and likeness for additional sales.

3. Ms. Barbash has amassed a significant social media presence, gaining over 230,000 followers on Instagram alone. Her sponsored social media posts command tens of thousands of dollars. Her image and likeness is the commodity upon which she earns her living.

4. Thus, it came as a surprise for Ms. Barbash to discover recently that her image and likeness were being used by Defendants in their fashion enterprises. Defendants never requested, consulted, or informed Ms. Barbash regarding the use of any of her publicity rights in connection with the clothing sold on their online platforms. Nor, if asked, would Ms. Barbash have consented to such use for the articles of clothing, some of which were described by some Defendants as "best sellers" and inappropriately marketed to young children.

5. Defendants' unauthorized uses of Ms. Barbash's image and likeness for commercial purposes in connection with the promotion and sale of clothing are in plain violation of Ms. Barbash's right of publicity. Accordingly, Ms. Barbash seeks actual damages, restitution and disgorgement of profits, and other relief, including punitive damages, for their knowing and unauthorized use and intentional misappropriation of Ms. Barbash's right of publicity.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and complete diversity of citizenship exists among the parties.

7. Each Defendant is subject to the personal jurisdiction in New York State (either directly or through agents) under CPLR 302(a)(1) because each, upon information and belief,

"transacts . . . business within the state or contracts anywhere to supply goods or services in the state."

8. Defendants have transacted business in New York State, either directly or through agents, via the sale of apparel and other goods into New York State.

9. The claims asserted herein arise out of business conducted in New York State by Defendants because, upon information and belief, Defendants sold the infringing goods into New York State.

10. Each Defendant is subject to the personal jurisdiction in New York State (either directly or through agents) under CPLR 302(a)(3) because each, upon information and belief, committed a "tortious act without the state causing injury to person or property within the state . . ." and "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."

11. Upon information and belief, each Defendant (either directly or through agents) committed a tortious act without New York State, e.g., the manufacture, advertising, and sale of the infringing goods, that caused injury to a person within the state, e.g. the violation of Plaintiff's, a resident of New York State, right of privacy.

12. Upon information and belief, each Defendant (either directly or through agents) regularly does and solicits business in New York State and derives substantial revenue from goods used and consumed in New York State.

13. Upon information and belief, Defendants (either directly or through agents) have generated millions of dollars in revenue from sales of their goods in New York State.

14. Upon information and belief, Defendants (either directly or through agents) expect or should reasonably expect their acts to have consequences in New York State because they sold the infringing goods into New York State where it was foreseeable that the infringing goods would be worn in New York State.

15. Upon information and belief, Defendants (either directly or through agents) derive substantial revenue from interstate commerce because they make billions of dollars annually.

16. In addition, the Shein Defendants have specifically directed sales and marketing activity towards New York customers by operating a "pop up shop" in New York City in or about 2022.

17. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

18. Plaintiff, Samantha Barbash, is a resident of the State of New York, County of Queens, residing within the jurisdiction of the Eastern District of New York (hereinafter "Ms. Barbash" or "Plaintiff").

19. Upon information and belief, Defendant Shein Distribution Corporation ("SDC") is a Delaware corporation with a principal place of business located in Los Angeles, California.

20. Upon information and belief, Roadget Business Pte. Ltd. is a private business entity formed and based in Singapore.

21. Upon information and belief, Zoetop Business Company, Limited is a private business entity formed and based in Hong Kong.

22. Upon information and belief, Shein Technology LLC is a Delaware limited liability company with a principal place of business in Los Angeles, California.

23. Upon information and belief, Shein US Services, LLC is a is a Delaware limited liability company with a principal place of business in Los Angeles, California.

24. Upon information and belief, Micas Holdings, Inc. is a corporation formed and based in China.

25. Upon information and belief, Precision Technology Holding Limited is a private business entity formed and based in China.

## FACTUAL BACKGROUND

### A. Shein's Instantaneous Success.

26. In just several years, Shein transitioned from a small Chinese-based seller of bridal clothing to a multi-billion-dollar fashion magnate. The brand first appeared on the radar of young American fashion consumers sometime around 2016 or 2017, which appears to correspond to the introduction of Shein's created algorithm offering a rapidly changing assortment of trendy and remarkably affordable clothing, shoes, accessories, and beauty products. Within just a few years, Shein has become one of the world's largest fashion retailers with annual revenue in the tens of billions of dollars.

27. Shein's success continues to grow at exponential rates. In May 2021, the SHEIN app became the most downloaded shopping mobile application in the U.S. on both iOS and Android, overtaking even downloads of Amazon's mobile application. In May 2022, that same mobile application became the most downloaded mobile application in the U.S. in any category, outperforming both TikTok and Instagram.

28. This success has also materialized on social media with over 35 million followers on Instagram, 10 million followers on TikTok, and almost 800,000 followers on X. These accounts

offer the brand additional opportunities to reach millions of consumers, without spending on traditional advertising.

29. Shein has accomplished all this, while selling $10 dresses, by being more of a big tech company than a traditional fashion company. Besides revolutionizing the apparel supply chain and micro-influencer marketing, Shein utilizes "big data" at the core of its design process.

30. Shein became a top clothier through the use of artificial intelligence and an algorithm. That algorithm has handily bested every human attempt to consistently design desirable clothing. A new corporate apparel company can spend millions on trend forecasting firms, designers, and consultants—but obviously, none has achieved anything close to Shein's success.

31. If there's a trend emerging, Shein is already on it before anyone has even realized it was developing. Shein openly boasts that it accomplishes this incredible feat through use of super-sophisticated technology, as opposed to the aesthetic prowess of its "designers." Shein's designs being so good is due, in some degree, to intellectual property misappropriation. On information and belief, most of their merit derives from the minds of other designers or piracy of famous media personality images, whose permission is never obtained or even sought.

**B. Shein's Intellectual Property Infringement.**

32. In March 2023, the Wall Street Journal reported *fifty* pending intellectual property infringement suits against Shein and its related companies.[1]

---

[1] Citing to *Good on You*, "Shein," March, 2023. https://directory.goodonyou.eco/brand/shein. Dan Strumpf, "China's Fast-Fashion Giant Shein Faces Dozens of Lawsuits Alleging Design Theft," Wall Street Journal, July 3, 2022; https://www.wsj.com/articles/chinas-fast-fashion-giant-shein-faces-dozens-of-lawsuits-alleging-design-theft-11656840601.

33. Without investigation, it's impossible to say how the Shein algorithm produces its results—how an image from an article or TV show finds its way from a factory in China, to then be offered for sale online for an affordable price.

34. These brazen copies constitute counterfeiting and piracy, under relevant copyright and trademark statutes and related case law.

35. The only viable explanation for the brazenness of Shein's knockoffs is Shein's policy to knowingly accept, tolerate and even encourage and facilitate such misappropriation.

36. Given the scale of Shein's design and production machine (generating 6000 new styles per day), the only way the algorithm could work (and as has been widely reported), is if very little information is communicated to the Shein "designers" —to the extent that humans are even involved—and factories other than the bare information about what the output should be. In other words, little or nothing is transmitted to Chinese factories beyond the original design itself. This approach, together with other aspects of the algorithm, guarantees that the infringements will occur.

37. When Shein copies a small or independent designer, the most likely outcome (without brand protection specialists and specialized software on the lookout) is that the infringement will go unnoticed. Under those circumstances, Shein reaps all the benefits of stealing and featuring the design that its technology had identified as valuable enough to take: it makes sales and keeps its customers' eyes glued to the Shein site and app for that much longer. And if customer demand justifies it, the item is reordered, and more are sold (now that the coast has been determined to be clear).

38. Oftentimes, the only way someone is alerted to the infringement is through happenstance; a customer or friend happens to see it—and complains to Shein. In these cases,

Shein sometimes quickly apologizes, blames an unnamed third party for the misconduct, and reports (often but not always accurately) that sales were shockingly low.

### C. Shein Use Ms. Barbash's Image on Articles of Clothing.

39.     Directly or through wholly or partially owned subsidiaries and/or agents, in early 2023, Shein began to knowingly utilize the image and likeness of Ms. Barbash for commercial purposes.  This usage continued until at least November 2023.

40.     Upon information and belief, Shein was aware that they were using Ms. Barbash's image and that they did not have consent to do so.

41.     The image utilized by Shein was a photograph of Ms. Barbash.   Sample uses of Ms. Barbash's image on clothing sold by Shein is shown below:



42.     Shein used Ms. Barbash's image and likeness without the legal right to do so to create clothing sold on their public website.

43.     The image and likeness of Ms. Barbash is proprietary to her, the rights to which have never been transferred to any third party for commercial purposes.

8

44. The use of the image and likeness of Ms. Barbash constitutes an illegal misappropriation by Shein.

45. Upon information and belief, Defendants selected and used Ms. Barbash's image because she is a well-known public figure whose likeness is readily recognizable to consumers. Defendants used her image on apparel and in marketing materials to draw attention to their products and to increase sales. Purchasers and prospective purchasers recognized the image as depicting Ms. Barbash and bought the apparel, in whole or in part, because it featured her likeness.

46. The misappropriation of the image and likeness of was for commercial purposes and not protected speech under the First Amendment of the United States Constitution and the Constitution/Laws and/or Statutes of the State of New York.

47. When Shein injected the image and likeness of Ms. Barbash into the stream of commerce, Shein knew or should have known that they had no legal right to do so.

48. Shein directly profited from the sales of the clothing effectuated as a result of its promotion.

49. Upon information and belief, Defendants promoted articles of clothing with the image and likeness of Ms. Barbash on its website, fashion apps, in various pop-up stores and other media throughout the world from early 2023 through at least November 2023. Upon further information and belief, similar apparel and marketing materials featuring Ms. Barbash's image and likeness remained available for purchase and public display beyond that period.

50. Ms. Barbash notified Defendants through their Instagram account of the misappropriation of Ms. Barbash's image and likeness.

51.     The misappropriation of the image and likeness of Ms. Barbash has harmed her financially and damaged her reputation within the modeling community. Further, Defendants' actions have caused the loss of significant business opportunities for Ms. Barbash.

52.     Upon information and belief, Defendants' unauthorized use of Ms. Barbash's image and likeness on apparel and related listings did not cease immediately after discovery in 2023 but continued to appear and circulate through Defendants' online platforms, mobile applications, and retail channels for a period thereafter. Because Defendants exclusively control their online catalogues and sales data, the full duration of these infringing listings is presently unknown to Ms. Barbash but is believed to have extended into 2024 and possibly later.

53.     Upon information and belief, Defendants repeatedly promoted, sold, and re-displayed apparel and related products bearing Ms. Barbash's name, image, and likeness on their online platforms and other retail channels after the initial appearance of the infringing garments. Each such instance constituted a new and distinct use of Ms. Barbash's likeness for commercial purposes occurring within the period preceding the commencement of this action.

54.     Upon information and belief, Defendants' online marketing and sales operations involve thousands of rapidly changing product listings distributed across multiple international websites and mobile applications. Given the volume and fluid nature of these listings, Ms. Barbash could not reasonably have determined whether or for how long apparel featuring her image and likeness remained available for purchase after her initial discovery of the infringement. She first learned of the full scope of Defendants' continuing use within the year preceding the commencement of this action.

### D. Likelihood of Consumer Confusion and False Endorsement

55. Upon information and belief, Defendants used Ms. Barbash's image and likeness in commerce in a manner that was likely to cause consumers to believe that she had endorsed, sponsored, or otherwise approved of the apparel bearing her image.

56. As set forth above, Ms. Barbash's name, image, and likeness have come to identify her as a distinct public figure and media personality whose persona possesses substantial commercial value and brand recognition. Her social-media following and notoriety within the entertainment industry function as source-identifying symbols of endorsement in the marketplace.

57. Defendants' sale and promotion of the infringing apparel were executed through their retail websites, mobile applications, and social-media advertisements directed to consumers throughout the United States and within the State of New York.

58. Members of the public viewing the infringing products on Defendants' websites and social-media platforms were likely to be misled into believing that Ms. Barbash authorized or affiliated herself with Defendants' brands, thereby harming her ability to control the commercial use and reputation of her image.

59. Defendants' misuse of Ms. Barbash's image was willful and in bad faith, undertaken to capitalize on Ms. Barbash's established brand and celebrity persona, including the notoriety arising from the film *Hustlers*.

### E. Micas' Intellectual Property Infringement

60. Directly or through wholly or partially owned subsidiaries and/or agents, Micas knowingly used the image and likeness of Ms. Barbash for commercial purposes.

61. Upon information and belief, Micas used Ms. Barbash's recognizable image on apparel to attract consumer attention and to increase the appeal and marketability of its products.

11

62. Upon information and belief, Micas was aware that they were using Ms. Barbash's image and that they did not have consent to do so.

63. The image utilized by Defendants was a photograph of Ms. Barbash. A sample use of Ms. Barbash's image on clothing sold by Defendants is shown below:



64. When Ms. Barbash reached out to Micas about the use of her image, Micas acknowledged fault and negligence:



  65. Micas used Ms. Barbash's image and likeness without the legal right to do so to create clothing sold on their public website.

  66. The image and likeness of Ms. Barbash is proprietary to Ms. Barbash, the rights to which have never been transferred to any third party for commercial purposes.

  67. The use of the image and likeness of Ms. Barbash constitutes an illegal misappropriation by Micas.

68. The misappropriation of the image and likeness of was for commercial purposes and not protected speech under the First Amendment of the United States Constitution and the Constitution/Laws and/or Statutes of the State of New York.

69. The misappropriated image of the image and likeness of Ms. Barbash was injected into the stream of commerce.

70. When Micas injected the image and likeness of Ms. Barbash into the stream of commerce, Micas knew or should have known that they had no legal right to do so.

71. Micas directly profited from the sales of the clothing effectuated as a result of its promotion.

72. The misappropriation of the image and likeness of Ms. Barbash has harmed her financially and damaged her reputation within the modeling community. Further, Micas' actions have caused the loss of significant business opportunities for Ms. Barbash.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(For Violation of Plaintiff's Right to Publicity)**

73. Plaintiff repeats, reiterates, and re-alleges each of the allegations contained herein in this cause of action as if repeated hereat at length.

74. Plaintiff is an infamous media personality and influencer.

75. Defendants knowingly utilized the image and likeness of Plaintiff for commercial purposes.

76. Defendants' use of the image and likeness of Plaintiff was done without permission from Plaintiff.

77. Defendants benefitted from the use of the image and likeness of Plaintiff.

78. Defendants used Plaintiff's image and likeness in a manner designed to capitalize on her public persona. The apparel was marketed and sold precisely because it featured Plaintiff,

whose recognizable likeness motivated purchasers seeking to associate with her image and celebrity. Defendants thereby misappropriated Ms. Barbash's identity for their own financial gain and used her likeness for purposes of trade without her consent.

79. As such, Plaintiff was injured financially, emotionally, and suffered damage to her professional and personal reputation as a result of Defendants' actions.

80. That by reason of the foregoing, Defendants are liable to Plaintiff in an amount in excess of $5,000,000.00 or such other amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (For Unjust Enrichment)

81. Plaintiff repeats, reiterates, and re-alleges each of the allegations contained herein in this cause of action as if repeated hereat at length.

82. Upon information and belief, Defendants misappropriated and utilized the image and likeness of Plaintiff for commercial purposes.

83. Models and famous social media influencers are customarily compensated for the use of their image monetarily.

84. Plaintiff was not compensated by Defendants for the use of her image and likeness.

85. Defendants were fully aware that they had misappropriated the image of Plaintiff.

86. Defendants, in good conscience and equity, should not be allowed to retain the benefits they received from Plaintiff without compensating her for their misappropriation of her image and likeness.

87. Plaintiff was injured financially, emotionally, and suffered damage to her professional and personal reputation as a result of Defendants' actions.

88. That by reason of the foregoing, Defendants are liable to Plaintiff in an amount in excess of $5,000,000.00 or such other amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (For False Endorsement in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))

89. Plaintiff repeats, reiterates, and re-alleges each of the allegations contained herein in this cause of action as if repeated hereat at length.

90. Defendants, without authorization, used Plaintiff's name, image, and likeness in commerce in connection with the advertising, promotion, and sale of apparel and related products.

91. Defendants' use of Plaintiff's persona constitutes a false designation of origin and false endorsement within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

92. Defendants' unauthorized use of Plaintiff's image and likeness was and is likely to cause confusion, mistake, and deception among consumers as to the affiliation, connection, association, sponsorship, or approval of Defendants' goods and services with or by Plaintiff.

93. Defendants' use of Plaintiff's image caused consumers to believe that the products were connected with, sponsored, or approved by Plaintiff. Purchasers were drawn to the apparel because it featured Plaintiff herself, and members of the public recognized the image as hers. The inclusion of her likeness on the apparel was intended to, and did, capitalize on her identity and reputation, creating the false impression of her endorsement.

94. Defendants knowingly and willfully traded upon Plaintiff's reputation, goodwill, and commercial persona to promote their products and increase sales without consent or compensation of Plaintiff.

95. As a direct and proximate result of Defendants' false endorsement and misrepresentations, Plaintiff has suffered and will continue to suffer damage to her goodwill, reputation, and ability to license her image and likeness for commercial purposes.

96. Plaintiff has sustained monetary loss and irreparable injury for which she has no adequate remedy at law, and she is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a) to prevent further use of her image and likeness by Defendants.

97. Plaintiff is further entitled to recover Defendants' profits, her actual damages, enhanced or trebled damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

98. Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, rendering this an exceptional case under the Lanham Act.

## PLAINTIFF DEMANDS A JURY TRIAL

**WHEREFORE**, Plaintiff demands judgment as against Shein Distribution Corporation; Roadget Business PTE. LTD.; Shein Technology LLC, SHEIN US Services, LLC, Zoetop Business Company, LTD.; Micas Holdings INC., PRECISION TECHNOLOGY HOLDING Limited; and Does 1-10 as follows: on the First Cause of Action against Defendants for Violation of Plaintiff's Right to Publicity in the amount of $5,000,000.00, or such other amount as may be determined at the trial of this action, and exemplary damages pursuant to Section 51 of the New York Civil Rights Law; on the Second Cause of Action against Defendants for Unjust Enrichment in the amount of $5,000,000.00; on the Third Cause of Action for False Endorsement in Violation of the Lanham Act, 15 U.S.C. § 1125(a), for injunctive relief, disgorgement of Defendants' profits, Ms. Barbash's actual and trebled damages, attorneys' fees, costs, and such other and further relief as the Court deems just and proper; or such other amount as may be determined at the trial of this action; attorneys' fees; pre- and post-judgment interest; and for such other and further relief as the Court deems just and proper.

Dated: Buffalo, New York
December 3, 2025

                        **RUPP PFALZGRAF LLC**
                        *Attorneys for Plaintiff*

                        */s/ Daniel S. Hallak*
                        Daniel S. Hallak, Esq.
                        1600 Liberty Building
                        424 Main Street
                        Buffalo, New York 14202
                        (716) 854-3400